JAMES MORRIS and Wife, MAMIE, G. G. EAVES and Wife, CATH-
ERINE v. E. H. HOUSE.

(Decided December 22, 1899.)

*Sale of Real Estate for Assets—Infant Heirs—Docket En-
tries—Lost Papers—Lapse of Many Years—Presump-
tion.*

In a proceeding instituted by an administrator, in the old County
Court to sell land for assets, in which proceeding the papers
are lost and can not be found, but the case appears on the
docket of March Term, 1864, in the name of the administrator
against the heirs-at-law (without naming them) of his intes-
tate, and the docket entries show an order of sale, report of
sale, and confirmation of the report, it will be presumed, after
the lapse of more than thirty years, and in absence of proof to
to the contrary, and where the interests of third parties have
intervened, although two of the heirs were infants, that the
court had jurisdiction of the parties, and the order of sale valid.

CONTROVERSY WITHOUT ACTION, under sec. 567, of The
Code, submitted to *Starbuck, J.*, at Spring Term, 1898, of
the Superior Court of McDOWELL County.

Upon the agreed statement of facts, his Honor decided in
favor of plaintiffs, and defendant appealed.

No counsel for appellant.
*Mr. E. J. Justice*, for appellee.

FURCHES, J. This is a controversy without action, sub-
mitted under sec. 567 of The Code. The following is a
statement of the facts agreed upon by the parties:

1. John Carson, Sr., was the owner of a large tract of land
in McDowell County, and devised the same to his sons, J.
Logan Carson and George M. Carson.

2. J. Logan Carson and George M. Carson conveyed to

their brother, William M. Carson, a one-third undivided interest in said land, in trust for the benefit mentioned in said deed of trust.

3. William M. Carson, in pursuance of the power contained in said trust deed, conveyed one-third undivided interest in certain of said tract of land to his two sons, John Carson, Jr., and William L. Carson.

4. William L. Carson died intestate in 1862 at the age of about twenty-one years, and his real estate descended to his heirs at law.

5. The heirs at law of William L. Carson were the follow-lowing brothers and sisters of the whole or half blood, to-wit: John Carson, George S. Carson, Mrs. E. A. Motz, Mrs. Matilda Ervin, Mrs. Catherine Gowan; and the following children of his deceased sister, Mrs. Martha Burgin, to-wit: Mrs. Mamie Morris and Mrs. Catherine Eaves.

6. Mrs. Catherine Eaves inherited, by descent, from William L. Carson, one thirty-sixth interest in the lot of land in controversy, and which is hereinafter described.

7. That the following entry appears on the minute docket of the County Court for McDowell County, on September 21, 1863, to-wit:

"Ordered by the Court, that John Carson be appointed by the Court administrator upon the estate of William L. Carson, and that he give bond in the sum of $2,500.

"Bond executed, with R. C. Burgin surety thereto, which is accepted by the Court, and he was duly sworn and letters issued to him therefor."

On the minute docket of said court is also the following entry:

"Wednesday, March 23, 1864—John Carson, Administrator, etc., against the Heirs-at-Law of William L. Carson. Petition for Sale of Land to Pay Debts.

"It appearing to the satisfaction of the Court that the personal estate of William L. Carson, deceased, is insufficient to pay the debts and charges of administration:

"It is therefore ordered, adjudged and decreed that his administrator, John Carson, have license to sell the real estate of William L. Carson, which is specified in the petition, in order to pay such of the said debts and charges of administration as the personal estate be insufficient to discharge.

"It is further ordered and decreed that the said John Carson, after forty days advertisement at the court-house door in the town of Marion, and at three other public places in the county of McDowell, proceed to sell the said land at the court-house door aforesaid to the bidder at public auction, on a credit of 12 months, taking bond with approved surety for the payment of the purchase money, and report in writing to the next term of this court."

On May 5, 1864, an order appears on said docket in the following-entitled case, of which the following is a copy:

"John Carson, Administrator, etc., and Others, *ex parte*— Petition to Sell Real Estate to Pay Debts.

"It appearing to the satisfaction of the Court that the personal estate of William L. Carson, deceased, is insufficient to pay his debts and charges of administration:

"It is therefore ordered, adjudged and decreed that his administrator, John Carson, have a license to sell the real estate of the said William L. Carson, which is specified in the petition, in order to pay so much of the debts and charges of the administration and as the personal estate may be insufficient to discharge.

"It is further ordered and decreed that the said John Carson, after forty days advertisement at the court-house in the town of Marion, and at three or more public places in the county of McDowell, proceed to sell said land at the court-house door aforesaid to the highest bidder at public auction, on a credit of 12 months, taking bond with approved surety for the payment of the purchase money, and report to this court."

On September 25, 1866, there was made upon the said minute docket of the said County Court of McDowell an entry which is as follows:

"John Carson, Administrator, etc., and Others, *ex parte*—
Petition to Sell Real Estate Debts.

"This cause coming on to be heard, and it appearing that John Carson, administrator of William L. Carson, on the 20th day of September, 1864, in obedience to a former order in this cause, sold the land described in the petition to Caleb Motz, on a credit of 12 months, at the price of $1,058, and that he took bond with good security for the payment of the purchase money, and the said sale appearing to be just and reasonable:

"It is therefore ordered, adjudged and decreed that the said sale be in all respects confirmed.

"It is further ordered, adjudged and decreed that the said John Carson proceed to collect said bond, and that he apply a sufficiency of the proceeds thereof to the payment of such debts and charges of the administration as the personal estate may have been insufficient to discharge; and he is to report to this court any surplus which may remain in his hands after the payment of the same, to the end that the said surplus may be applied under the direction of this court for the benefit of the heirs of the deceased, according to the act of Assembly."

8. That no papers relating to the administration of William L. Carson's estate, or to the sale of the land belonging thereto, can be found, if any ever existed, and no entry in reference thereto, other than what is copied in full above, appears on any of the court records of McDowell County.

9. That John Carson, on the 15th day of July, 1873, executed to Caleb Motz a deed; and Caleb Motz executed to John Carson a deed bearing date July 16, 1873.

It will be seen from the facts agreed that the County Court of McDowell, at March Term, 1864, made an order authorizing a sale of the lands of W. L. Carson for assets to pay debts. It appears to have been made in an action of "John Carson, administrator, etc., against the heirs-at-law of W. L. Carson." It appears that at May term of the same court, another order was made in similar, if not the same, terms, authorizing a sale of the intestate's lands for assets to pay debts. This appears to have been an action styled "John Carson, administrator, and others, *ex parte.*"

At September Term, 1866, the administrator made a report of sale to Caleb Motz at the price of $1,048, when said report was confirmed in these words: "It is therefore ordered, adjudged and decreed that the said sale be in all respects confirmed." No other papers connected with this proceeding to sell land, nor with regard to the administration or settlement of W. L. Carson's estate, can be found.

The plaintiffs contend that these orders of sale are void, and that the sale made under them is also void, and conveyed no title to the purchaser. And, as it is admitted that they were minors at that time; that they were married before they were 21 years of age, are now and have been under the disability of coverture ever since their marriage; that no statute of limitation had run against them, that they are entitled to recover.

This presents the question as to whether these orders of sale were void, as claimed by the plaintiffs, or not.

It was claimed on the argument for the plaintiffs (and we are not furnished with any argument or brief for defendant), that the sale was made under the second order (May Term, 1864), which order is styled "John Carson, administrator, etc., and others, *ex parte*," and the report of sale is styled "John Carson, administrator, etc., and others, *ex parte*, and the plaintiffs contend that this of itself shows that they were not parties. We do not assent to this proposition, though the better and more regular way would have been to make the heirs-at-law of the defendant's intestate parties-defendant, yet we do not say that this was absolutely necessary in order to bind the heirs and convey the title. It has been held that it was not. *Harris v. Brown*, 123 N. C., 419, and *Ex Parte* Avery, 64 N. C., 113.

But it appears, by the facts agreed, that there was an order authorizing this sale, at March Term, 1864, in a case of John Carson, administrator, against the heirs-at-law of his intestate, W. L. Carson. And no reason has been assigned, and we can see none, why he should have brought another action returnable to the next term of the same court for the same purpose, when he had already obtained an order of sale at the previous term; and we do not believe he did. How this second order happened to be made, we do not positively know. But as we see no reason for making it, and no sale having been made under it, a bungling clerk, in time of the war, when he was thinking more about that than about the duties of his office, brought it forward on his docket and inadvertently styled it "John Carson, administrator, etc., and others, *ex parte*." If this was not the case, or if this is not an explanation of the second order, as we think it is, the entry "John Carson, administrator, etc., and others, *ex parte*" strongly sustains the view that the *heirs-at-law* of W. L. Car-

son were made plaintiffs with the administrator.    It shows
that some others were parties besides the administrator, and
who could have been these *other parties* but the heirs-at-law
of his intestate, W. L. Carson?    It was not necessary that
anyone but the administrator and the heirs-at-law of W. L.
Carson should have been parties.

But if the administrator had two orders to sell, one of
which authorized the sale and the other did not, and he made
the sale and reported it in the wrong case, can it be con-
tended that the sale is void on that account?    The adminis-
trator was an officer of the court in making this sale, and
while it would have been irregular for him to report the sale
as having been made under one order when it was made under
another, yet this irregularity does not make the sale void.
Suppose an officer has two capiases for the arrest of B, one of
which is valid and the other is not, and he makes the arrest,
and, in making his return, by mistake or inadvertence, he
makes it on the wrong paper—the bad capias—will it be
contended that he had no authority to make the arrest, and
is liable for damages for false imprisonment?    We think not.

It is true that the entries and judgments that can now be
found do not show who were parties except the administrator,
John, and the *heirs-at-law* of W. L. Carson, in one entry, and
John Carson, administrator, etc., *and others,* in the other
entry.    But these entries were made *thirty-five years* ago,
and all the papers connected with the case are lost and can not
be found.    It is probable that, if they could be found, they
would show that the proceeding was regular; and as this
might appear to be so if we had the papers, the law *presumes*
that it is so.    The County Court at that time had jurisdic-
tion of the subject matter—had power to order the sale of
real estate for assets—and sufficient appears to show that it
had the matter before it on petition, and that it took jurisdic-
tion and ordered the sale.    The jurisdiction of the parties

and the regularity of the proceeding will be presumed unless the contrary is plainly shown, where the matter has stood as long as this has, and the rights of third parties have intervened, as they have here.

In *Sledge v. Elliott,* 116 N. C., on p. 717 (a case from the same county), it is said that, "After it has remained unimpeached for nearly thirty years, the burden of overcoming a presumption of fairness and regularity in the original record rests upon anyone who seeks to disturb a title founded on it." The case of *Sledge v. Elliott* is very much like this, and, as we think, the opinion was put upon solid ground.

In *Adams v. Howard,* 110 N. C., 15, the administrator got a license to sell land for assets in 1860, and sold a part of the land. After 1866 he sold other lands, and it was contended that he had no right to sell under that order, and steps were taken to get another order, and another order was obtained, in the nature confirming the sale. But this was attacked for irregularity, and the Court held that the second order was not necessary; that the first order authorized the sale. The case further states "that after a lapse of 20 years, the appellants ask to set aside the sale for irregularities without showing that they have been at all prejudiced by them."

The case of *Hare v. Holloman,* 94 N. C., 14, is very much like the case under consideration: An action for possession of land that had been sold by an administrator for assets, where the sale is attempted to be avoided. There, the record had been lost or destroyed, as in this case. In that case the Court say: "Not only do these entries show the special facts which they recite, but by aid of the maxim *omnia presumuntur rite esse acta,* they furnish inferential evidence of the regularity of that precedent action, upon which the validity and efficiency of what those entries show to have been done by the Court were dependent. This rule is indispensable

when, as in the present case, the original papers in the case have been burned or lost.  \*  \*  \*  It is therefore a reasonable inference that the petition did set out the names of the others as well as the name of one of the defendants to whom as a class the land descended."

In *England v. Garner,* 90 N. C., 197, it is said:  "If he was an infant this fact did not render the judgment as to him absolutely void.  It was irregular, and might, upon proper application, have been set aside, not however, to the prejudice of bona fide purchasers, without notice."

It is also said in *Hare v. Holleman, supra*:  "We should be reluctant to disturb titles acquired under the former practice, universally recognized and acted on in this State, thus introducing distrust and confusion in regard to the tenure of estates, and the loss of confidence in the judicial action of the courts, the mischievous results of which can hardly be foreseen, and we could do so only under clear and cogent convictions of error entering into them."

It being shown that the court had jurisdiction of the subject matter—the right to order a sale of land for assets; that it had a petition before it for that purpose, and that it acted upon the petition and made the order, it must be, and it is presumed, in the absence of proof to the contrary, that the proceeding was regular, and the court had jurisdiction of the parties.  The administrator having the authority to sell under one or both of these orders, it made no difference under which he reported the sale.  At most, this was only an irregularity for which this Court, *thirty-five* years afterwards, will not declare the order of sale void when the interests of third parties are involved, and when it is not shown that anyone has been damaged, and when it is not shown but what every dollar was necessary to pay debts, and no fraud has been alleged.

We can not thus jeopardize title to land where parties have been holding thirty years and more. To allow such parties, now, to be turned out of house and home because some old record can not be found that has been accidentally or purposely destroyed, thereby enabling some remote heir to claim the land, would not be just.

There is another question presented by the case agreed which seems not to have been considered in the judgment of the Court, but which we think we ought to pass upon; that is, the sufficiency of the description in the deed. And we do not see why this is not sufficient to enable the parties to locate the land. It would seem that the 640-acre grant, upon which the town of Marion is located, might be identified. And if it is located, it would seem that the 400-acre tract, which is a part of the 640-acre tract, might also be located, by getting the deed to the part theretofore sold off of the 640-acre tract, and locating that boundary. It seems to us that a surveyor might take these deeds and locate the 400-acre tract.

There is error, and the judgment is

Reversed.

DOUGLAS, J., dissenting. I can not concur in the opinion of the Court, because, to my mind, it conflicts with the express provisions of the Constitution of the United States, and of the State of North Carolina. Art. XIV, sec. 1, of the amendments to the Federal Constitution, says: "Nor shall any State deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Sec. 17 of the Declaration of Rights, in our State Constitution, provides that, "No person ought to be taken, imprisoned or disseized of his freehold, liberties or privileges, or outlawed or exiled, or in any manner deprived of his life, liberty or prop-

erty, but by the law of the land." The phrase "law of the land" has been repeatedly interpreted to mean "due process of law." The Supreme Court of the United States, in *Walker v. Sauvinet,* 92 U. S., 90, says: "A State can not deprive a person of his property without due process of law. * * * This requirement of the Constitution is met if the trial is had according to the settled course of judicial proceedings. Due process of law is process due according to the law of the land. This process in the States is regulated by the law of the State." It is too well settled to require any citation of authority that entire strangers are not bound by a judgment, and I presume it is equally settled that no judgment can be rendered without some form of action or special proceeding, which in this State must always be commenced by summons or attachment. Code, secs. 161, 287. It is true that under the old practice infants were sometimes brought into court, where a suit was already pending, by the appointment of a guardian *ad litem,* without personal service.

But this has nothing to do with the case at bar, as there is no pretense that any guardian *ad litem* was ever appointed for anyone. It is absolutely essential from principles of natural justice, as well as of the highest public policy, that the rights of infants should be protected. Adults can protect themselves. No one is compelled to buy land at an administrator's sale, and in any event he can protect himself by a proper inspection of the record. A purchaser is a voluntary actor, while the infant, whose lands are taken without his consent or even his knowledge, is, at best, a passive sufferer. The power to sell land for assets is in derogation of the common law. Even now land descends to the heir, and the title which vests in him by operation of law remains in him until divested by due process of law. In this case it does not appear anywhere in the records of the court that the heirs-

at-law of William L. Carson, or any of them, ever became, or were made, parties to the proceeding under which the land was sold; nor is there even a recital to that effect. Even the general phrase "heirs-at-law of William L. Carson" appears only once in the title of the proceeding; and nowhere is the name of a single individual given as one of such heirs-at-law.

But it is said that, in the interest of innocent purchasers, the law must presume all things to have been rightly done. Innocent children are entitled to as much protection as innocent purchasers, too many of whom calmly close their eyes in the happy assurance that "where ignorance is bliss, it is folly to be wise."

Can the purchaser be said to have been an "innocent purchaser" in this case? John Carson, as administrator, deeded the land to Caleb Motz, on the 15th day of July, 1873, and on the following day Motz deeded back the same land to John Carson. I do not see how an administrator can ever be, in the legal sense of the term, an innocent purchaser at his own sale. Let us examine the cases cited by the Court, bearing in mind that in the case at bar there is no proof or even recital that these plaintiffs were ever served with process, or became parties voluntarily or by the appointment of a guardian *ad litem*. The fact that the minute book in which the orders of sale are entered and in which the order appointing a guardian *ad litem* should have been entered, if ever made, contains no allusion to any such order, strongly tends to prove that no such guardian was ever appointed.

In *Harris v. Brown,* 123 N. C., 419, cited by the Court, the minor heirs were not asking any relief. It was the purchaser who was seeking to avoid the payment of the purchase money. In that case, this Court says: "In adversary proceedings, the parties are at arm's length, and each one fights

125——36

for victory. In such cases, if minors are parties without guardian, general or special, it is irregular, and on arriving at maturity they may reject or accept at their option. But in *ex parte* proceedings they *must be represented* by a guardian or next friend." In Avery *ex parte,* 64 N. C., 113, this Court held in express terms that "the heirs must be made defendants, and be represented by a duly constituted guardian *ad litem.*"

In *Sledge v. Elliott,* 116 N. C., 712, 716, it appeared that the Clerk of the Court had been appointed guardian *ad litem,* and the *decree recited* that service had been made upon *all* the parties.

In *Adams v. Howard,* 110 N. C., 15, it was held that the land was authorized to be sold under an order made in a proceeding where the infants were parties represented by a guardian *ad litem,* and that the fact that the license to sell, as renewed in a proceeding where the heirs were not made parties, did not *invalidate* the previous valid order. It was also shown that the adult heirs were present at the sale and offered no objection.

In *Hare v. Holleman,* 94 N. C., 14, the following entry appears upon the record: "L. C. Cowper is appointed guardian *ad litem* to the defendants, who accepts service of the petition and submits to a decree." As in all the cases cited by the Court it was shown affirmatively that a guardian *ad litem* had been appointed wherever the interests of minor heirs were affected, I do not see how they sustain the opinion of the Court. Personal service upon the infant might presume the appointment of a guardian *ad litem,* or the appointment of a guardian *ad litem* might presume service or take the place thereof; but surely one can not presume the other where neither is shown to exist. Every presumption must have some established fact to rest upon. Let us see what some

other cases hold as to the effect of a judgment against infants, who are neither parties, nor appeared by guardian:

In *Larkins v. Bullard*, 88 N. C., 35, (very much like the case at bar), the Court says: "The finding of the Court seems to go to the length of saying that, notwithstanding the order directing it to be done, the infant children of John Bullard were never in fact made parties to the action or any defense made for them; and if so, then, under the authority of *White v. Albertson*, 3 Dev., (14 N. C.), 241, the judgment against them was *absolutely void ab initio,* and it was proper to give them relief by directing the same to be vacated as to them."

In *White v. Albertson,* 14 N. C., 242, Chief Justice HEN-DERSON, speaking for the Court, says: "The only objection which has the appearance of solidity, is, that the defendants, the heirs, were not made parties. If the fact be so, the judgment is *void;* for there can be no judgment but against one in Court. It is not according to the course of the Court to render judgment against one not brought into court.".

In *Jennings v. Stafford,* 23 N. C., 404, GASTON, J., speaking for the Court, says: "But if what is offered as a judgment have merely the semblance thereof; as if it be rendered by a court having no jurisdiction of the subject matter, or against a person who *has not had notice* to defend his right, or if it order what the court has not power to order, so that upon its face the law can pronounce it null, it is not a judgment."

In *Doyle v. Brown,* 72 N. C., 393, Judge READE, speaking for the Court, lays down the rule in his usual, clear, concise and forcible manner, as follows: "Where a defendant has never been served with process, nor appeared in person or by attorney, a judgment against him is not simply voidable, but *void,* and it may be so *treated whenever and wherever offered*

without any direct proceedings to vacate it. And the reason is, that the want of service of process and the want of appearance are shown by the record itself wherever it is offered. It would be otherwise if the record showed service of process or appearance, when in fact there had been none. In such case, the judgment would be apparently regular, and would be conclusive until by a direct proceeding for the purpose it would be vacated. A plaintiff needs not to be *brought* into court; he *comes* in. A judgment is of no force against a person as plaintiff, unless the record *shows* him to be plaintiff. If the record shows him to be plaintiff, when in fact he was not, then it stands as where the record shows one to be defendant when he is not. In *both* cases the *record* is conclusive until corrected by a direct proceeding for that purpose."

This rule applies directly to the case at bar, as the record does not show that the infant heirs were either served with process or appeard by guardian. But it is said that only part of the record can be found. The answer is that what is found, the minute docket, does not tend to prove, even by recital, the fact of service or appearance. The mere fact that the minute docket contains both orders of sale and the decree confirming the sale, and yet makes no allusion to the appointment of a guardian *ad litem,* tends strongly to prove that no such guardian was ever appointed. My attention has never been called to any record where the professed parties were *affirmatively* shown by the record itself not to have been served with process or appeared. The absence of all proof, direct or by implication, of such fact is taken as at least tending to prove its want of existence, if not conclusive proof. *Armstrong v. Harshaw,* 12 N. C., 187; *Stallings v. Gulley,* 48 N. C., 344; *Condry v. Cheshire,* 88 N. C., 375. These well-considered cases also sustain the rule that where one has

never become a party either by service of process or appearance, any judgment against him is absolutely void. The extent to which they have been cited and approved may be seen from Womack's Digest.

For the reasons above stated, I am clearly of the opinion that the judgment of the court below should be affirmed. I fully share in the reluctance of the Court to disturb ancient titles after so long a lapse of time, but I am equally reluctant to deprive anyone of his property without due process of law.

MONTGOMERY, J.   I concur in the dissenting opinion.